IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRANDI BOSCH, et al., | } | |
| | } | CIVIL ACTION NO. |
| Plaintiffs, | } | 03-AR-0463-S |
| | } | |
| v. | } | |
| | } | |
| TITLE MAX, INC., et al., | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendants, Title Max, Inc.("Title Max") and Tracy Young ("Young"), for summary judgment as against Brandi Parker ("Parker"), one of the two plaintiffs in this case. Parker claims that Title Max failed to pay her the overtime compensation required by the Fair Labor Standards Act ("FLSA"). Title Max argues that Parker was exempt from the FLSA's overtime rules and regulations. Also before the court is Title Max's motion to strike portions of Parker's evidentiary submission in response to the motion for summary judgment.[1]

### Facts

Title Max, Inc.  is a corporation that, through affiliated corporate entities, operates about 150 stores. Its sole business is to lend money against a person's automobile title. Title Max

---

[1]Title Max's motion to strike is deemed moot by separate order, as unnecessary to the finding of summary judgment.

1

has locations in Alabama, Georgia, Tennessee, and South Carolina. The operations in each state are run as a separate company under the Title Max umbrella; for example Title Max of Alabama, is the local subsidiary here involved. Tracy Young is the CEO and sole shareholder of Title Max, the parent company. Title Max is divided into five regions, each region with twenty districts. Each region has a regional manager, and each district has a district manager.

The manager operates the individual store, answering to the district manager, then the regional manager, then ultimately to Young. District managers cover at least ten stores. District managers usually audit a store twice a month, and usually no more often than that. Parker's district manager while she was working for Title Max was Ken Greathouse.

In June 2001, Parker applied to Title Max for the job of store manager. She was offered the job of "manager trainee" with the understanding that she would become a store manager at the completion of her training. Parker began work at Title Max of Tuscaloosa # 2 on June 25, 2001. As a manager trainee, she received $400 a week. At the end of August 2001, she was promoted to the store manager position over Title Max of Tuscaloosa #2. Parker held that job until she transferred to Tuscaloosa #1 in August 2002. She was the manager of that store until she resigned in October 2002. Parker was paid $500 a week as a base salary,

2

which increased over time, as well as a bonus equaling five percent of her store's profits. Profits were determined by subtracting the store's bad debt, management fees, regular expenses, and other expenditures from receipts. Thus, Parker's bonus was related to her ability to keep miscellaneous costs and bad debts low and receipts high.

During the entire time Parker was at Tuscaloosa #1 she had two assistant managers under her. Some evidence indicates that the actual duties of managers and assistant managers were not all that different. The primary differences were in dealing with the main office, and in terms of planning what the other employees would do. Managers and assistant managers all did appraisals, "chase work," customer service, and making bank deposits. However, Parker testified that she made all the calls, found who needed to be chased down, assigned that work, contacted the district managers, faxed the district manager the pawn reports, made sure the store opened on time, was responsible for paying the stores bills, monitored proof of claims made in bankruptcy court, decided what supplies are needed and purchasing them, hired outside contractors, and paying referral fees. While at Tuscaloosa #1, Parker had two assistant managers for approximately two weeks before Adam Latham was terminated.

Parker did not directly hire or fire employees. She interviewed prospective employees, and made recommendations to

her district manager. Title Max procedures instruct the manager to call her district manager if an assistant manager is not doing his job and needs reprimanding. The manager makes recommendations as to whether to fire the assistant manager or any other employee. Parker recommended the termination of two assistant managers, Adam Latham and Lori Dolan, and they were terminated. A manager has the discretion of whether or not to call the district manager to inform him of a problem with an assistant. Parker verbally reprimanded assistant managers for unacceptable performance without the knowledge or permission of her district manager.

Parker was the primary trainer of new assistant managers. While the district managers took an active role in the training, they only performed training while visiting on their twice monthly audits. Most of the day to day training of assistant managers is done by the store manager. There was no training period for assistant managers, mostly the training of assistant managers was continuously being performed by the manager. Parker often pointed out things her assistant managers could improve upon.

The best interest of Parker, like other managers, was in keeping the store as profitable as possible. While profit margin was the concern of Young, as well as the regional and district managers, Parker received a monthly bonus equaling five percent

4

of the store's profits. For the purposes of her bonus, profit was determined after the store's payroll, bad debt, management fees, regular and miscellaneous expenses were subtracted from receipts. Thus, Parker's bonus increased as receipts climbed, and as expenditures declined. Assistant managers did not receive such a bonus.

Young routinely sent his employees e-mails known as "Tips of the Day." These e-mails covered a range of areas throughout the business, from employment policies, the appearance of the outside of the store, rates to charge, to things such as some suggested successful sales pitches. The "Tips" were to be read by managers, initialed, and put in a three ring binder for reference. Listing these "Tips of Day" *ad nauseum* is unnecessary, but it seems relevant to say a number of important, as well as unimportant, directives came from Young in these "Tips of Day." Many important rules, suggestions, and commands, for running a Title Max location were distributed via "Tips of the Day."

Title Max is in the business of lending money on a thirty day basis, taking the customer's car title as collateral. These thirty day loans essentially operate like a pawn. A critical part of the business is the appraisal of the car so that its value as collateral can be determined. Parker, like other store managers, performed inspections and appraisals of vehicles before lending money on the title. The manager inspected and graded the vehicle

using the letters "A" (the best) through "F" (the worst). Title Max employees were not supposed to lend money on vehicles graded "F". Young directs his managers to look at a long list of items when performing an inspection, for instance: the age of the car, paint quality, sound of engine, condition of interior, mileage, condition of the tires, among other things. Parker graded vehicle using the guidelines given to her, but ultimately had to make judgment calls on whether cars were graded A,B,C or F, without direct supervision.  Both through "Tips," and the Title Max appraisal guide, Young gave careful guidance to his managers and assistant managers on performing appraisals. However, the store manager is ultimately responsible, without supervision, for appraising and inspecting all the pawns executed in her office. The "Tips" itself even notes "that the Manager of the office is responsible for all new pawns/loans made in their office." (10/18/01 Tip of the Day).

Based on guidelines from Title Max, store managers, such as Parker, determine a wholesale value for a vehicle. The maximum loan amount authorized by Title Max is based on a fixed percentage of this wholesale value. Managers were not allowed to lend more than that amount to a customer. Title Max stores used the wholesale value, as determined by the manager, and not the blue book value to determine how much money to lend on a particular car. Managers were allowed to use a range or

"tolerance" of $50 on older vehicles when the managers "believe" the wholesale value of the vehicle is around $600. Thus, a manager's judgment as to the value of a car is critical.  The manager of store was required to sign off on every loan given by the store.

"Chase work" is Title Max's term for its efforts to collect on past due accounts. "Chase work" usually entails going to a customers' home or work to get into contact with the customer, and to collect past due accounts. A manager would have the authority to decide when to do chase work for the most part. District managers would go through the past due accounts and question what the manager had done to collect on the account. If the accounts went more than a certain of days past due, and there was no contact by the manager, then the district manager had the authority to step in and decide whether or not to chase the account. Sometimes chase work would be done during the day, but if that failed, often, evening or night chase work would be required to make contact with the customer. Title Max makes it the store manager's responsibility to keep so called "bad debt" under two percent. Therefore, Parker often decided on her own whether to run a "skip trace" or credit report on a delinquent customer in order to locate the customer.  When a customer brought in a past due payment, Title Max required the customer to pay "expired fees." Depending on the total fee owed, payment

history, and delinquency, Parker occasionally allowed the customer to avoid paying the late fee.

Parker claims that she did not repossess vehicles without the approval of her district manager. Parker says that when she contacted her district manager concerning a repossession she provided him with the facts of the pawn, and gave her recommendation on whether or not to try repossession. Sometimes the district manager would follow her recommendation, and other times he would reject it. Parker says that the ultimate decision of whether to seek repossession rested with the district manager. However, Parker also cites to a "Tips," which says that an account must be fifteen days past due before it can be put out for repossession, *unless approved by a district manager*. Parker, also, made recommendations to her district manager about whether to transfer an account to "Lot 55," which meant that Title Max would cease collection efforts. Parker made her recommendations based on her knowledge of all of the account information.

Parker made the decision of which repossession service to use, but Title Max had guidelines and "Tips" to help her determine whether a particular repossession service was acceptable. For instance, in "Tips" Young said that managers themselves should not repossess vehicles. Further, managers should only use repossession services with proof of insurance, and managers should keep copies of the proof of insurance on

file. This policy was to be certain that the repossession
service, and their insurance company, would be able to pay any
claims if something went awry during the repossession. If a
repossessed vehicle needed repairs, the "Tips" noted that the
manager should seek the approval of the district managers before
having repairs done.

Parker does not know if she was allowed to sell a
repossessed vehicle without the approval of her district manager.
However, she usually sought his approval before selling a
vehicle. While she usually did seek his approval, evidence
indicates that there were occasions when she sold a car before
seeking approval. Parker did however perform first hand
negotiation with the dealers to see if she could get a higher
price or structure a package of cars in a way to increase the
price paid for the cars. In most cases, Parker sought three bids
from three different dealers, and took the highest of the bids.
However, she noted, the exception was where she made a package
deal of vehicles. In that case, she took the bid that she thought
best suited Title Max, choosing among the various packages, and
prices offered. Parker normally sought approval for these
transactions, even though it was not required. If the bids for
the vehicles did not reach an acceptable level, Parker, and her
district manager, sent the cars to the auction in Birmingham.

Title Max stores are open from 8 a.m. to 6 p.m.. Title Max

had a written policy that instructed managers to not allow
assistant managers to work more than forty hours a week. However,
Parker claims that Title Max actually imposed a policy on her
store that all chase work was to be done after hours, forcing
assistant managers to work over forty hours in a week. The
evidence actually supports only the finding that Title Max
required "chase work" to be performed after regular business
hours. The rest of the evidence indicates that district managers,
and managers, were instructed to keep employees under forty hours
a week, even if they had to perform after hours "chase work."
This was to be done by scheduling assistant managers to miss a
day of work or sending them home later in the week, so that they
did not go over forty hours. Parker had the responsibility of
keeping her assistants under forty hours a week, even when they
were required by company policy to do some after hours chase
work. Parker often failed to keep her assistant managers under
forty hours a week, despite the strong command from "Tips of the
Day" and her district manager that she do so. In other places,
Parker argues that Title Max's written policies and "Tips of the
Day" were ironclad and limited her discretion entirely. Here,
however, she says that the written policies were ignored.

## Analysis

Title Max argues that even if Parker was denied overtime
compensation, she was exempt from the overtime provisions of §

207, under both (or either) the administrative exemption and the
executive exemption. Title Max seeks summary judgment only on
these grounds.

An employee is not entitled to overtime compensation if
he/she is exempt from the FLSA overtime provisions by 29 U.S.C. §
213. Exemptions under the FLSA are construed narrowly against the
employer. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590,594
(11th Cir. 1995). A job title is of little use for exemption
purposes, so the court turns to the "short test" articulated by
regulations. For the "short test" to apply, an employee must have
made at least $250 a week throughout the employment period. There
is no dispute that Parker made at least that amount throughout
her employment. The "short test" for administrative exemption is
therefore the appropriate test for exemption. Because Parker was
paid on a salary basis, there remains only one part of the "short
test" to satisfy.

The "duties" portion of the "short test" requires a showing
that the primary duty of the employee was "office or non-manual
work directly related to management policies or general business
operations of his employer or his employer's customers and he
uses discretion and independent judgment in his work." 29 C.F.R.
§ 541.2(e)(2).

Parker agrees with Title Max, and concedes that she (and all
Title Max managers) performed work which was "office or non-

manual." Thus, only the last two elements of the "short test"
involve matters of dispute for the purposes of Title Max's
motion.

## A. *Directly Related to Management Policies or General Business Operations*

Parker says she is not exempt from FLSA overtime
requirements because she was not involved in "work directly
related to management policies or general business operations."
Parker says her primary duty was not related to the management
policies or general business operations of Title Max. There does
not appear to be one clear test for this portion of the duties
test, and several different approaches have been employed.
Ultimately under any of them, Parker's work appears to qualify as
directly related to "management policies or general business
operations."

One test advanced calls upon the court to determine whether
the primary duty of the employee is management. This test is
derived from the test for the executive exemption. An employee's
primary duty *may be* the duty he/she performs more than fifty
percent of the time. 29 C.F.R. § 541.103. This court, like many
other courts, is not particularly interested in determining how

the percentages break down between one duty and another.[2] In most cases that seems a useless, and, indeed, senseless endeavor in light of the inherent overlap between management duties and non-management duties that inheres in cases where there is serious dispute over whether an employee is exempt from overtime restrictions. Generally, if there is any dispute at all about the role of an employee, it will be because it is difficult to distinguish the various roles the employee plays. Thus, this fifty percent test seems a silly exercise.

A more useful question is whether or not Parker's managerial duties constituted the primary value her employer placed upon her. *See, e.g.*, *Baldwin v. Trailer Inns, Inc.*, 266 F.3d. 1104, 1115 (9th Cir. 2001); *Aly v. Butts Cty.,* 841 F.Supp. 1199, 1204(M.D. Ga. 1994). The "principal value" of Parker's work came from her duties as manager. A four-part test, springing from the former 29 C.F.R. § 541.103, is sometimes used to determine whether an employee's primary duty was that of management. These four inquiries are: (1) whether Parker's managerial duties were more important than her non-exempt duties; (2) did she regularly exercise discretionary power; (3) was she free from day to day supervision; and, (4)did she receive wages greater than non-exempt employees. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d

---

[2] *See*, *e.g.*, *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982)(finding that the so called fifty percent rule was not especially useful in situations where the management and non-management duties were difficult to separate).

1104 (9th Cir.2001); *see also Haines v. Southern Retailers, Inc.*, 939 F.Supp. 441, 450-1 (E.D. Va. 1996). While this test is specifically applicable to the "executive exemption," it is also useful in considering whether a plaintiff's duties fall into the administrative exemption. It seems clear that the principal value of Parker's work was in her role as manager, because she was the highest ranking employee at her store, and was responsible for all of the store's day to day operations, she exercised discretionary authority over a number of issues[3], and she received both a higher base salary than her assistant managers, as well as a performance bonus not available to her assistant manager counterparts.  The employee "in charge" of a facility on a day to day basis has most often been found to have management as their primary duty. Parker directed and supervised her assistants' work, scheduled their work, recommended the hiring and firing of employees, and she made the decisions about what work could be delegated to assistant managers and what work she needed to do herself. Further, she was responsible for the training of new employees. Parker balanced the store's checkbook, ensured deposits were made, and that the store had cash on hand. Parker was the employee ultimately responsible to the higher ups at Title Max for everything that occurred at her location.

---

[3]Not to give away of the end of this charming tale, but the next section of this opinion specifically determines that Parker regularly exercised discretion and independent judgment as store manager for Title Max.

14

Parker counters with the contention that her work was not related to general business or management because "the work of Managers is administerial in nature" and managers served "as office administrators" with little to no influence on actual management. The regulations have led courts to hold that work "directly related to management policies" is not limited to the actual formulation of corporate policies, but includes the responsibilities of carrying out management policies. *See Debrecht v. Osceola County*, 243 F.Supp.2d 1364, 1372 (M.D. Fla. 2003)(citing 29 C.F.R. § 541.205(c)). Thus, while it is true that Parker had virtually no role in determining the policies or general business direction of Title Max, she did have significant say in the enforcement and implementation of those policies at her store. Title Max notes that under Parker's theory of the case the only Title Max employee who is exempt would be Young, himself, because he alone formulated and circulated management polices. This would read the exemption entirely out of the FLSA. Thus, while this court necessarily reads exemptions narrowly, it is clear that the exemption cannot reasonably be read as narrowly as Parker suggests. Thus, because Parker was the primary person carrying out and enforcing management policies in her Title Max location it is clear to this court that her job primarily involved the duty of management.

Parker also received the credit and blame for the day to day

effectiveness of the store. The district managers visited the stores only a couple of times a month. On almost all days, Parker was the highest ranking employee to set foot inside her Title Max store. When the district manager did come on site for audits, or reviews, it was Parker who was held accountable to the him, not anyone else. The level to which Parker was seen as responsible for the day to day success of her Title Max location is made exceedingly clear by the fact that she got a bonus each month based on her store's profitability. This shows that Title Max viewed the degree of profitability at each Title Max store as a matter within the control of each store manager. Parker's work can only be fairly described as "managerial."

Further, the bonuses, along with the higher salary, show that managers were seen in a different light that the other employees at a Title Max location. At other points in her analysis, Parker argues that assistant managers and managers shared many duties. While there is certainly truth to the claim of overlapping duties, the difference in pay scale, and structure, indicates that managers were paid for something beyond what the assistant managers provided. Otherwise, Title Max would simply have employed three assistant managers at each store and paid them all the lower wage. The difference in pay indicates that the value of Parker's work was in direct relation to the performance of her duties.  It is possible to be a manager

16

without making all of the policy decisions.

The Eleventh Circuit has waded ever so slightly how to apply the administrative exemption's "duties" requirement. That court has held that an employee is not covered by the administrative exemption if he works primarily on the "production" side of the business. "Those persons involved in 'production' or in a 'retail or service establishment' ('sales') are not administrative employees." *Hogan v. Allstate Insurance Co.*, 361 F.3d 621, 626 (11th Cir. 2004). In *Hogan*, the plaintiffs were found to be on the administrative side of the business because they promoted sales, adapted policies to customers needs, decided on budget for supplies, hired, fired and trained staff, delegated routine matters to their staff, and oversaw the operation of the office and staff. Parker's duties sound similar enough to those critical to the determination in *Hogan* to warrant a finding that she was involved in the administrative, rather than the production side of the business. Parker promoted sales to customers, and helped to structure the loans for customer so that they borrowed the full loanable value of their vehicle. Parker made recommendations on the hiring and firing of staff. Parker was the person primarily responsible for training her new assistants. Parker delegated routine appraisals, chase work, and other tasks, to her assistants when it did not require her direct attention. These duties are more administrative tasks.  While Parker did also have

17

some "production" tasks, her central value to Title Max was
ultimately that she was above the other employees and able to
manage the store and enforce the guidelines and "Tips" sent down
from higher management. Otherwise, Title Max would merely have
hired three "clerks" and paid them all an equally low salary.
Parker's administrative and management duties are what separated
her from assistant managers. Ultimately, the undisputed facts
support the conclusion that Parkers' primary duty was directly
related to either the "management policies or general business
operations" of Title Max.

Parker bizarrely invokes the term "administerial" to
differentiate her job from the one exempted as "administrative."
While she does cite cases from other courts that have used such a
term, presumably she is making an argument that her work was
somehow too unequivocal to be related to "general business
practices" or "management". Parker's duties, however, comport
with a number of duties that the Eleventh Circuit has found part
and parcel of "administrative" work relating to "management
policies or general business practices." Whatever this argument
is supposed to import, it is likely covering ground redundant
with the independent judgment and discretion prong of the short
test, and is best covered there.

**B. Uses Discretion and Independent Judgment in Her Work**

Title Max cannot be successfully disputed when it points out

18

that Parker exercised "discretion and independent judgment" in
her work. The exercise of independent judgment and discretion
involves the use of "comparison and the evaluation of possible
courses of conduct and acting or making a decision after the
various possibilities have been considered." 29 C.F.R. § 541.207
(a); *see also, e.g., Debrect*, 243 F.Supp.2d at 1372. Further, the
regulations note that this phrase "implies that the person has
the authority or power to make an independent choice, free from
*immediate* direction or supervision and with respect to matters of
significance." 29 C.F.R. § 541.207 (a) (emphasis added). That a
plaintiff receives significant oversight, and does not have
limitless discretion does not mean that her job does not "include
work discretion and independent judgment." *Hogan*, 361 F.3d at 627
(finding that even where the manner and type and style of sales
by plaintiffs was closely regulated by their superiors,
plaintiffs still exercised discretion and independent judgment
because adapted products to customers needs, delegated routine
matters to staff, hired and trained staff, promoting products to
customers). In *Hogan*, the Eleventh Circuit found the short test
satisfied by a group of insurance agents who were heavily
supervised by both national Allstate managers, as well as agency
managers who supervised twenty to twenty-five agents. This case
is very similar to *Hogan*.

    Parker's job required her to use her discretion and to

exercise independent judgment. Parker was fully responsible for the day to day operations of the store. She scheduled her assistants' work, decided when and how to chase down delinquent accounts, appraised vehicles, and negotiated with dealers. Each of these job functions, along with many others listed by Title Max, required Parker to make an evaluation of many possible courses of conduct, and to make ultimate decisions critical to the success or failure of the business.  While it is clear that Parker received guidance and oversight on how to perform her duties, she used her own independent judgment to perform most of the functions of her job. An employee can still exercise discretion and independent judgment even when her job is "heavily regulated" by the employer to minimize the amount of discretion the employee uses.  *Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 518-19 (6th Cir. 2004).  While the Tips of the Day were certainly important to Parker's job, the "Tips" seem mostly to be reminders of things that would be obvious to most managers.  In fact, the majority of the "Tips" are not particularly limiting of the manager's discretion.[4] Thus, the claim that a Title Max could

---

[4]For example, Parker cites as her no. 43 that Young informed employees of a new payroll policy in which their payroll is wired on the 1st and 15th of the month. While that shows control by the main office, it does not show any meaningful limit on Parker's discretion in her job. Parker's no. 45 is that Young "mandates" that no Title Max is to have a television on the premises. These are merely illustrations to show how innocuous most of the "Tips of the Day" actually were. While these Tips may show that Parker's discretion was not "limitless," it does not indicate in anyway that her job did not include the exercise of discretion or independent judgment. *See Hogan*, 361 F. 3d at 627.

successfully operate merely by following the "Tips of the Day" is a tad flimsy. Even those "Tips" that are specific directives did not rob Parker of her managerial discretion, or act as a substitute for her independent judgment.

In fact, one of the strongest arguments for Parker's use of discretion, in light of Young's daily "Tips," is the other half of this lawsuit, the separate claim of plaintiff, Brandi Bosch ("Bosch"). Parker, and the other managers, were told by Young to keep assistants to less than forty hours of work a week to avoid having to pay overtime. The facts, as plead by Bosch show that Parker, routinely allowed/made Bosch, an assistant manager, work over forty hours a week. Thus, while this is a trivial example in light of the other facts in this case, it is illustrative of the fact that Parker exercised discretion even in the face of the volumes and volumes of "Tips" from Young.

Parker also made recommendations about the hiring, firing and discipline of assistant managers. While it is true that she made only recommendations most of the time, these recommendations still required the use of Parker's independent judgment and often, discretion. Parker interviewed applicants and presented a recommendation to her district manager based on her evaluation of the interviewees in comparison to one another. Those recommendations show the use of independent judgment. That her choice was not always followed does not indicate a lack of

21

judgment on her part. *See, e.g.,  Bondy v. City of Dallas*, 2003
WL 22316855, *2 (5th Cir. 2003)(citing the regulations, and
finding that "decisions made as a result of the exercise of
discretion and independent judgment may consist of
recommendations for action rather than the actual taking of
action"). Likewise, Parker exercised what could only fairly be
characterized as "discretion" in determining whether or not to
report assistant managers to the district manager for discipline.
On occasion Parker handed out verbal discipline to an assistant
manager rather than reporting the conduct to the district manager
for discipline. That was certainly an exercise of discretion.

While there was much direction from Young, as well as from
the district managers, Parker was the highest ranking employee at
her location. The only logical conclusion is that Parker
regularly exercised discretion and independent judgment in her
job. While the scope of her discretion was not "limitless,"
Parker regularly considered possible options, evaluated them, and
chose among courses of action. It is virtually impossible to
conceive of a free standing business location without a
"manager." Title Max, could not, and did not, manage by remote
control.

All the undisputed evidence considered, Parker has satisfied
the short test for administrative exemption under the FLSA.
Therefore summary judgment is appropriate on this ground alone.

**Executive Exemption**

Given the overlapping analysis of the administrative and executive exemptions, it also seems likely that for all of the time during which Parker was directing the work of two assistant managers, she was also exempt from the FLSA under the executive exemption. Because the executive exemption requires the direct supervision of two or employees, and there might be some dispute about whether or not Parker was supervising two employees at all times of her employment with Title Max, it appears that the executive exemption might not be entirely dispositive of all of Parker's claim. 29 C.F.R. § 541.1(f).  Because the administrative exemption is dispositive, this court need not rely on the alternative ground of "executive exemption" for summary judgment. However, because the much of analysis used to conclude that Parker met the administrative exemption is lifted from the executive exemption, for all periods of time in which Parker had two or more employees under her charge, summary judgment is also appropriate under the "executive exemption."

**Conclusion**

Because there exist no genuine issues of material fact, summary judgment of all claims by Brandi Parker is appropriate. Title Max's, and Young's motion will be granted by separate

order. Title Max's motion to strike will become moot.

DONE this ___7th____ day of February, 2005.


_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE